**HUTHWAITE, INC., Plaintiff,**

v.

**SUNRISE ASSISTED LIVING, INC., Defendant.**

**No. CIV.A.02–1478–A.**

United States District Court, E.D. Virginia, Alexandria Division.

April 25, 2003.

William F. Dolan, Melissa Masiello, Noelle J. Quinn, Bell, Boyd & Lloyd, LLC, Chicago, IL, Robert J. Sciaroni, Andrew N. Cook, Bell, Boyd & Lloyd, PLLC, Washington, DC, for Plaintiffs.

Howard J. Shire, Kenyon & Kenyon, New York City, William Merone, T. Cy Walker, Ronald L. Sigworth, Kenyon & Kenyon, Washington, DC, for Defendants.

### MEMORANDUM OPINION

ELLIS, District Judge.

The three potentially dispositive questions presented on summary judgment in this copyright and trademark action are

(i) whether, in an action for copyright infringement, a copyright owner may satisfy the Copyright Act registration requirement, 17 U.S.C. § 411(a), by re-lying on an exclusive licensee's copyright registration that inaccurately identifies the licensee as the copyright "claimant,"

(ii) whether defendant's alleged use of plaintiff's trademark in connection with defendant's internal sales training program meets the Lanham Act requirement of use "in connection with the sale, offering for sale, distribution, or advertising of goods and services," for trademark infringement and unfair competition claims, 15 U.S.C. §§ 1114, 1125(a), and

(iii) whether defendant's alleged use of plaintiff's trademark meets the Federal Trademark Dilution Act requirement of "commercial use" for trademark dilution claims, 15 U.S.C. § 1125(c).

### I.

Plaintiff Huthwaite, Inc. ("Huthwaite") is a Delaware corporation with its principal place of business in Sterling, Virginia. It is a leading provider of sales training seminars and related publications to individual and corporate customers nationwide.

Defendant Sunrise Assisted Living, Inc. ("Sunrise") is also a Delaware corporation and, like Huthwaite, its principal place of business is located in Northern Virginia—McLean, Virginia. Sunrise is a major provider of assisted living services to seniors at numerous facilities across the country that it either owns or manages for others. At the end of 2001, Sunrise reported that it operated approximately 181 facilities in 24 states and the District of Columbia, as well as five non-U.S. facilities, with a total capacity of 14,700 residents. Of these facilities, more than half (97) are wholly owned by Sunrise, approximately one-third (65) are partly owned by Sunrise, and the remainder (24) are managed by Sunrise for third parties.

With respect to Huthwaite's copyright claim, the central work at issue on this summary judgment motion is a book entitled *SPIN Selling*, authored by Neil Rackham, Huthwaite's founder and its owner until May 2000. *SPIN Selling* is a best-selling book on the subject of sales training and effectiveness; it discusses Mr. Rackham's research on this subject and advocates the "SPIN Selling" approach to sales. The book was published by McGraw–Hill, Inc. in 1988 pursuant to a May 15, 1987 Publishing Agreement between Rackham and McGraw–Hill. In the Publishing Agreement, as amended on June 30, 1987, Rackham granted McGraw–Hill "the exclusive right to reproduce and distribute" the work in North America, but he retained "all exclusive rights to the Work not expressly granted herein," including the right to translate, serialize, or prepare video, audio, electronic, or database versions of the work. Although the Publishing Agreement originally granted McGraw–Hill the full bundle of copyright rights to the book, this provision was eliminated in a subsequent June 30, 1987 amendment. In lieu thereof, a provision was inserted limiting McGraw–Hill's rights to the exclusive right to reproduce and distribute the book in English in North America. A sentence appointing McGraw–Hill "as [Rackham]'s attorney-in-fact to execute any documents [McGraw–Hill] deems necessary to record any of these grants with the United States Copyright Office or elsewhere" was left unchanged in the Publishing Agreement.

On July, 28, 1988, McGraw–Hill registered *SPIN Selling* with the United States Copyright Office. *See* U.S. Reg. No. TX 2–365–674. Although this registration correctly identifies Neil Rackham as the author of the work, it incorrectly lists McGraw–Hill as the copyright "claimant" and states that McGraw–Hill obtained ownership of the copyright "[b]y assign-

ment from the author." *See* U.S. Reg. No. TX 2–365–674; Def. Reply Ex. C. Thereafter, in May of 2000, Rackham assigned to Huthwaite all of his retained rights in the *SPIN Selling* copyright.

This dispute is not limited to copyright claims relating to the *SPIN Selling* book; also involved are trademark claims relating to trademarks for SPIN and SPIN SELLING. Specifically, Huthwaite owns two federally registered trademarks at issue here: SPIN, Reg. No. 1,481,588 (registered March 22, 1988), and SPIN SELLING, Reg. No. 2,413,866 (registered December 19, 2000). The marks are registered for "training and questionnaire booklets and manuals" and other materials in the field of sales training development and for "educational services— namely, providing sales training programs and seminars." *See* Reg. Nos. 1,481,558 & 2,413,866.

During the summer of 2000, Sunrise contacted Huthwaite and expressed an interest in purchasing sales force training services from Huthwaite. The parties discussed a possible contract for sales training services, but in the end Sunrise declined to purchase Huthwaite's sales training services. Thereafter, in May 2001, Sunrise hired Mark Hannan as its Senior Vice President of Sales. Beginning in the summer of 2001, Sunrise, under Hannan's supervision, launched a "major sales transformation" that included the training of its sales staff using the SPIN Selling approach. Each student in the training program was provided a copy of *SPIN Selling* and the *SPIN Selling Fieldbook*, both authored by Rackham. In connection with this training program, Sunrise developed and used training guides and training materials, including the works entitled "Selling Skills Facilitator's Guide," "Selling Skills Student Guide," "Sales Transformation Launch

Facilitator's Guide," "Sales Transformation Launch Student Guide," and "Excellence in Selling," all of which Huthwaite claims violate its retained rights to the copyright relating to *SPIN Selling*, as well as Huthwaite's rights under other SPIN related copyrighted works.[1] Although the record evidence is not complete with regard to the degree of similarity between Huthwaite's copyrighted works and the Sunrise materials, the existing record discloses that the Sunrise materials employ some phrases, metaphors, and diagrams similar or identical to those used in Huthwaite copyrighted works as a group, and to *SPIN Selling* in particular, the work at issue on this motion.[2]

The current record also discloses that four Sunrise employees have been identified as the authors of the allegedly infringing Sunrise training materials: Hannan, Marty Ramseck, Anne Kelly, and Eileen Spinella.[3] Three of these—Hannan, Ramseck and Kelly—were exposed to Huthwaite's training seminars and materials in their previous employment. Hannan, the

---

1. As is noted *infra*, Huthwaite's First Amended Complaint lists four works in addition to *SPIN Selling* for which it claims copyright infringement. Of these listed works, only the *SPIN Selling* copyright is challenged in this summary judgment motion.

2. Pertinent here is Huthwaite's exhibit that compares, page by page, Sunrise's *Selling Skills Student Guide* to various Huthwaite materials, including *SPIN Selling*, in an effort to show substantial similarity or copying. The following examples are illustrative.

(i) To discuss objection prevention and objection handling, *SPIN Selling* uses a box and arrow diagram with two branches flowing from a box labeled "Implied Need," with the handling approach on the left and prevention on the right. *Selling Skills* also uses a two branch diagram for the same purpose. The key words from the text of the *SPIN Selling* diagram are included in the *Selling Skills* diagram. (e.g. "Customer states Explicit Need" becomes "Explicit Need.")

(ii) To illustrate the "buy/don't buy" decision, *SPIN Selling* uses two contrasting diagrams, entitled "value equation," which show

*Spin Selling*
"Pick *just one behavior* to work on"

"Choose *safe* calls for practicing the new behavior"

"Concentrate on using *a lot* of the behavior rather than using it well.
"Try *at least* 3 times before judging whether it works"

3. There is some dispute regarding the identity of the authors of the Sunrise training materials. In listing these four, Huthwaite relies on

a balance scale with an arrow pointing up to "buy" or "don't buy," in which the "seriousness of problem" is balanced against the "cost of solution." *Selling Skills* also uses two diagrams showing balance scales with arrows and the text "value equation," "buy," "don't buy," "seriousness of problem" and "cost of solution."

(iii) *SPIN Selling* breaks the selling process into four stages, entitled "Preliminaries," "Investigating," "Demonstrating Capability," and "Obtaining Commitment," and illustrates the stages with four arrows containing the names of the stages. *Selling Skills* breaks the selling process into four stages, entitled "Opening/Preliminaries," "Investigating Needs," Demonstrating Capability," and "Obtaining Commitment," and illustrates the stages with four boxes containing the names of the stages.

(iv) *SPIN Selling* provides four pointers for "learning a new skill," illustrated in boxes with arrows. *Selling Skills* provides four pointers for "Getting the Most from Selling Skills," summarized in bullet points. The pointers are:

*Selling Skills*
"Pick just one behavior—don't overload yourself, one at a time."

"Choose safe calls—don't practice with the 1A accounts, make potential learning mistakes with a new lead or a 3 or 4 lead."
"Use it a lot—quantity will create quality."

"Try at least 3 times—don't give up to [sic] quickly"

Hannan's deposition testimony. Yet, Sunrise itself does not include Kelly in its list of the authors of the Sunrise materials.

selfdescribed principal author of the Sunrise materials, is very familiar with Rackham's books and theories; he had access to Huthwaite's training seminars and training materials in his previous position at CIGNA, where he advocated the use of the SPIN Selling method and retained Huthwaite to teach the method to CIGNA employees.

On the trademark side of the ledger, it is undisputed that Sunrise used the SPIN and SPIN SELLING marks in connection with its sales training program. Specifically, Sunrise provided SPIN Selling training to a significant number of its employees in several different states, some of whom have now left Sunrise for other employment.[4] Sunrise's sales training materials use the SPIN and SPIN SELLING marks to advocate and teach the SPIN Selling sales method. Furthermore, the record indicates that the classes themselves were referred to internally at Sunrise alternatively as "SPIN Selling" or "Selling Skills" classes. Some or all of the Sunrise SPIN Selling training seminars are conducted at public facilities. In fact, the record contains evidence of one instance of confusion on the part of a Huthwaite customer when Sunrise and Huthwaite both conducted SPIN Selling training at the same time and conference center in Illinois. In addition, the record reflects that Sunrise's internal sales force typically experiences high turnover, as much as 60% in a given year.

Huthwaite agrees that the current summary judgment record discloses this much, but contends that it discloses more, as well. Specifically, Huthwaite claims that it is likely that Sunrise has trained non-employees, namely the employees of those facilities Sunrise operates and manages for third party owners. While Huthwaite concedes there is yet no direct evidence that Sunrise has trained anyone other than its own employees, it notes that an inference to this effect is invited by the record fact that Sunrise receives a commission from third party owners for providing services that include marketing and training of third party owners' employees. Yet, because Sunrise currently disputes that it trains any other entities' employees, the analysis here proceeds on the premise that Sunrise used the SPIN SELLING and SPIN marks only internally, not in connection with its sale of assisted living services to its customers or in connection with its provision of management services to third-party owned facilities.

Huthwaite filed this action on October 14, 2002, alleging that Sunrise's sales training programs and materials violated Huthwaite's rights under federal copyright and trademark laws. Specifically, Huthwaite claims copyright infringement, pursuant to 17 U.S.C. § 501, and trademark infringement, false designation of origin, and trademark dilution, pursuant to 15 U.S.C. § 1114 and § 1125(a) & (c). On January 10, 2003, Sunrise filed a motion for summary judgment directed at all four of Huthwaite's claims. Thereafter, on February 4, 2003, Huthwaite filed an amended complaint, significantly altering and reducing the list of Huthwaite works relied on in the copyright claim. In the original complaint, Huthwaite claimed a violation of its copyright in *SPIN Selling* and twenty other works, while the amended complaint retains only *SPIN Selling* from the original list of infringed works and adds four new copyrighted works al-

---

4. Attendance lists indicate that approximately 480 Sunrise employees have attended sales training seminars. Sunrise contends that only 100–150 employees have actually been trained in the SPIN Selling method, and that the remaining merely attended "rollout" sessions where SPIN Selling was briefly discussed, but no training occurred.

leged to be infringed by Sunrise. Of these four, two are copyrighted books, *The SPIN Fieldbook*, Reg. No. TX 4–325–696, and *Managing Major Sales*, Reg. No. TX 3–118–768, and two are copyrighted training guides developed by Huthwaite, "SPIN Coaching and Selling Skills Program," Reg. No. TX 2–751–288, and "SPIN Workshop," Reg. No. TX 2–739–315. Sunrise's motion for summary judgment on the copyright claim focuses on Huthwaite's claim for infringement of the *SPIN Selling* copyright.

Sunrise attacks Huthwaite's *SPIN Selling* copyright claim on the grounds (i) that Huthwaite has failed to establish ownership of the *SPIN Selling* copyright, (ii) that there is no valid registration of the *SPIN Selling* copyright upon which Huthwaite may bring this action, and (iii) that Huthwaite has not shown that the allegedly infringing materials are substantially similar to the *SPIN Selling* book.[5]

Sunrise attacks Huthwaite's claims for trademark infringement and unfair competition on the ground that Huthwaite cannot show that Sunrise used the SPIN and SPIN SELLING marks "in connection with the sale, offering for sale, distribution, or advertising of any goods or services," as the Lanham Act requires. 15 U.S.C § 1114; *see also* 15 U.S.C. § 1125(a) (requiring use "in connection with any goods or services"). Sunrise also argues that Huthwaite has failed to show "commercial use" of the trademark, as re-

quired for the trademark dilution claim. 15 U.S.C. § 1125(c). Further, Sunrise argues that Huthwaite has failed to make a sufficient showing of actual confusion or trademark dilution as required to support the trademark claims. Finally, Sunrise has filed a counterclaim, contending that Huthwaite's SPIN and SPIN SELLING trademarks are "generic," and seeking cancellation of the trademark registrations pursuant to 15 U.S.C. §§ 1064 & 1119.

After an initial hearing on the motion for summary judgment on February 14, 2003, the motion was taken under advisement and the parties were ordered to filed supplemental briefs. *See Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, Civil Action No. 02–1478–A (February 14, 2003) (Order). Following this supplemental briefing, the motion for summary judgment was denied. *See Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, Civil Action No. 02–1478–A (March 14, 2003) (Order). This Memorandum Opinion sets forth in more detail the reasons for that ruling.

## II.

### A. Copyright registration

■ Copyright registration is a threshold statutory prerequisite to a copyright infringement action.[6] But significantly, § 411(a) requires only that the copyright be registered, not that the party filing the copyright infringement action be the party

---

5. In its original summary judgment motion, Sunrise argued that Huthwaite had not shown that Sunrise had access to any of the works listed in the original complaint, other than *SPIN Selling*. Because these other works are no longer in issue, this question has become moot. By contrast, there is no dispute that Sunrise and its employees have had access to *SPIN Selling*; the uncontradicted record shows that Sunrise's employees were provided copies of this work at the Sunrise training sessions.

6. *See* 17 U.S.C. § 411(a) (stating that "no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title"); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279 (4th Cir.2003) (describing copyright registration as a "jurisdictional prerequisite" under § 411(a)).

that registered the copyright. In other words, "[t]here is no requirement under the [Copyright Act] that the only person who may bring an action is the person who applies for the copyright registration." *Tang v. Hwang*, 799 F.Supp. 499, 503–04 (E.D.Pa.1992); *see also* Melville B. Nimmer, *et al.*, *Nimmer on Copyright* § 12.02[B] (stating that "the plaintiff in court obviously need not be the same party who initially registered the subject work"). And, it is clear that a copyright may be registered by "the owner of copyright or of any exclusive right in the work." *See* 17 U.S.C. § 408(a); *Morris v. Business Concepts, Inc.*, 259 F.3d 65, 71 (2nd Cir.2001) (quoting 17 U.S.C. § 408(a)) (hereinafter *Morris I*), *reh'g denied*, 283 F.3d 502 (2002) (hereinafter *Morris II*). In sum then, a party suing for copyright infringement satisfies the threshold registration prerequisite as long as the copyright owner or the owner of any exclusive right in the copyrighted work has registered the work.[7]

Sunrise's initial argument is that there is no valid registration of the *SPIN Selling* copyright upon which Huthwaite may rely to satisfy § 411(a)'s requirement (i) because McGraw–Hill, not Huthwaite, registered *SPIN Selling* in 1988 and McGraw–

Hill had no right or authority to do so and (ii) because the copyright registration inaccurately lists McGraw–Hill as the copyright "claimant." Neither argument is persuasive.

■ Sunrise's first argument rests on the contention that the Publishing Agreement did not grant McGraw–Hill the authority to register the copyright for *SPIN Selling* on Huthwaite's behalf. In this respect, Huthwaite points out that the Publishing Agreement appoints McGraw–Hill as Rackham's "attorney-in-fact to execute any documents [McGraw–Hill] deems necessary to record any of these grants with the United States Copyright Office or elsewhere." Huthwaite claims this granted McGraw–Hill the authority to register the copyright on behalf of Rackham, whereas Sunrise claims that it merely granted McGraw–Hill power-of-attorney to record with the Copyright Office the copyright rights that Rackham had assigned to McGraw–Hill. In the end, this dispute is immaterial because McGraw–Hill, as an owner of an exclusive right in the work, was plainly entitled to register a copyright for the work. *See* 17 U.S.C. § 408(a) (stating that "the owner of copyright *or of any exclusive right in the work* may obtain registration") (emphasis added).[8] Specifi-

---

7. In addition to this threshold requirement, Huthwaite, to prove its claim for copyright infringement, must show that it owns the copyright to the work that was copied and that Sunrise copied protected elements of the work. *See Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir.1996). In the absence of direct evidence of copying, Huthwaite may raise a presumption of copying by showing (i) that Sunrise had access to the work, and (ii) that there is substantial similarity between the Sunrise materials and the work. *Id.* at 581–82.

8. Sunrise's assertion that only a copyright "claimant" may properly register a copyright for the purposes of § 411(a) is flatly contradicted by § 408(a) and unsupported by *Morris*. Section 411(a) requires simply that reg-

istration be made "in accordance with this title." Here, the registration of the copyright by McGraw–Hill, an exclusive licensee, is in accordance with § 408(a).

And, the *Morris* case relied on by Sunrise involves a quite different fact scenario from the one presented here. In *Morris*, the author of certain magazine articles, who had not registered a copyright for those articles, sued for copyright infringement of the articles and, in doing so, relied on the magazine's registration of a collective work copyright for the magazine issues in which the articles appeared for the purpose of satisfying § 411(a)'s registration requirement. The Second Circuit panel held that "[u]nless the copyright owner of a collective work also owns all the rights in a constituent part, a collective work registra-

cally, pursuant to the June 30, 1987 amendment of the Publishing Agreement, McGraw–Hill owns the "exclusive right to reproduce and distribute" *SPIN Selling*, and thus McGraw–Hill was entitled to register the copyright for *SPIN Selling*. And, it is clear that Huthwaite may rely on McGraw–Hill's registration of the *SPIN Selling* copyright to satisfy § 411(a)'s registration requirement. *See Tang*, 799 F.Supp. at 504 (noting that § 411(a) "merely provides that there must be registration of the copyright," not that the party bringing the infringement must have itself registered the claim).

■ The second prong of Sunrise's attack on the validity and sufficiency of the *SPIN Selling* registration is that the registration is invalid because McGraw–Hill inaccurately listed itself on the copyright application form as the copyright "claimant." It is true that a copyright "claimant" in whose name registration is made "must be either the author of the work or one who obtained ownership of the copyright, not merely one who obtained ownership of certain exclusive rights under the copyright." *Morris I*, 259 F.3d at 72; *see also* 37 C.F.R. § 202.3(a)(3) (stating that "a copyright claimant is either: (i) The author of the work; (ii) A person or organization that has obtained ownership of all rights under the copyright initially belonging to the author."). And, it is also true that McGraw–Hill owns only an exclusive right to publish, and thus is not properly listed as the copyright "claimant."

■ In listing itself as "claimant," McGraw–Hill simply made a technical error. Nor is there any evidence this error was anything other than inadvertent and immaterial, without effect on the validity of the registration. The error is thus a technical error of the type that does not render a registration invalid for the purpose of § 411(a).[9] Here, as there is no

---

tion will not extend to the constituent part." *Morris I*, 259 F.3d at 71, *see also Morris II*, 283 F.3d at 506 (reiterating that "if all rights in a constituent work have not been transferred to a claimant, a collective work registration will not apply to the constituent work"); *Xoom*, 323 F.3d at 284 (adopting the *Morris* rule). The magazine owned the exclusive right to publish the articles for ninety days, but did not own *all* of the copyright rights to the articles. *Morris I*, 259 F.3d at 67. It was in this context that the *Morris I* panel concluded that the magazine's registration of *the collective work* did not satisfy § 411(a) for the purposes of a copyright infringement action brought by the author with regard to *the individual work*. *Morris I*, 259 F.3d at 69. Thus, *Morris* does not stand for the proposition that a copyright owner may not rely on the registration of an individual work by an exclusive licensee in suing for the infringement of that same work. Indeed, as already noted, such a holding would contradict the plain language of § 411(a) and § 408(a). Moreover, after discussing and rejecting the argument that the registration of the collective work sufficed, the *Morris I* panel noted that, as an exclusive licensee, the magazine "had the right to register the copyrights in Morris's articles" under § 408(a), and proceeded to consider whether the magazine did in fact register a copyright for the individual articles. *Id.* at 72 (holding that the copyright registration was plainly intended to register a collective copyright for the magazine issues, not the individual articles). This additional analysis would have been unnecessary, if, as Sunrise contends, the *Morris* panel had held that an author who has retained copyright rights cannot rely on an exclusive licensee's registration of the work for the purpose of satisfying § 411(a).

9. *See Xoom*, 323 F.3d at 283 (holding that "immaterial, inadvertent errors in an application for copyright registration do not jeopardize the validity of the registration"); *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 357 (4th Cir.2001) (holding that "accidental but harmless mistakes in a copyright application do not subsequently preclude an infringement action against an alleged copier"); *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir.1994) (holding that "an error is immaterial if its discovery is not likely to have led the Copyright Office to

evidence of fraud or knowing misstatement, the erroneous copyright claimant information on the application form is no bar to jurisdiction under § 411(a), and Sunrise's threshold challenge to the copyright claim on this ground fails. *See Bouchat,* 241 F.3d at 357; *Kenbrooke,* 690 F.Supp. at 302.

■ Next, Sunrise asserts that summary judgment is appropriate on the copyright claim because Huthwaite has failed to show that it owns the copyright in *SPIN Selling. See Towler,* 76 F.3d at 581 (holding that the plaintiff in a copyright action must show ownership of the copyright to the work that was allegedly copied). This also fails, as the evidence regarding Huthwaite's ownership of the *SPIN Selling* copyright is more than sufficient to survive a summary judgment challenge. Documents submitted by Huthwaite, and not challenged by Sunrise, clearly establish a chain of ownership in the *SPIN Selling* copyright leading to Huthwaite. Under the June 30, 1987 amendment to the Publishing Agreement, Rackham, the author of *SPIN Selling,* granted McGraw–Hill the right to publish the work in North America, but retained all the other copyrights in the work. Subsequently, in May 2000, Rackham assigned his retained rights in the *SPIN Selling* copyright to Huthwaite. Thus Huthwaite, the current owner of all the copyright rights in *SPIN Selling* not granted to McGraw–Hill, may sue for the infringement of those rights, and Sunrise's motion to dismiss for failure to establish ownership must be denied.

■ Finally, Sunrise moves to dismiss the copyright claim with regard to *SPIN Selling* on the ground that Huthwaite has failed to show that the Sunrise materials are substantially similar to *SPIN Selling. See Towler,* 76 F.3d at 581. This motion is premature at this point, as it is brought before the submission of expert reports on the substantial similarity question. In any event, a review of the Huthwaite and Sunrise materials in the record suggests, at least for now, that a mature record will include sufficient evidence of substantial similarity to create a triable issue of fact on that question. *See Eaton v. Nat'l Broadcasting Co.,* 972 F.Supp. 1019, 1023 (E.D.Va.1997) (noting that summary judgment on the substantial similarity question is proper where "no reasonable jury, properly instructed, could find that the two works are substantially similar"). In particular, Huthwaite provides a page by page comparison of the Sunrise "Selling Skills Student Guide" and various Huthwaite materials that compares virtually every page in the Sunrise guide to allegedly similar copyrighted Huthwaite materials, including alleged similarities to *SPIN Selling.*[10] Furthermore, a general review of the Sunrise materials in the record and the *SPIN Selling* book indicates that the Sunrise materials employ some phrases, diagrams, and metaphors that a trier of fact might reasonably conclude are substantially similar to expressions found in *SPIN Selling.* In short, Huthwaite has provided sufficient evidence of substantial similarity to survive this early summary judgment motion.

refuse the application"). Several courts have found that an exclusive licensee's mistake in listing itself as the copyright "claimant" constituted inadvertent error. *See Wales Industrial Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 515 (S.D.N.Y.1985) (holding that where an exclusive licensee "erroneously identified itself on the registration[ ] as the 'copyright claimant,' ... this alleged error would not invalidate the registration[ ]"); *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.,* 690 F.Supp. 298, 301–02 (S.D.N.Y.1988) (same); *Tang,* 799 F.Supp. at 503 n. 13 (same).

10. *See supra* n. 2.

*B. Use in connection with goods or services under the Lanham Act*

■ To prevail on its claims for trademark infringement and unfair competition, Huthwaite must prove "(i) that it possesses a mark; (2) that defendant used the mark; (3) that the defendant's use of the mark occurred 'in commerce'; (4) that the defendant used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers." *See People for the Ethical Treatment of Animals v. Doughney,* 263 F.3d 359, 364 (4th Cir.2001) (hereinafter *PETA*); *see also* 15 U.S.C. §§ 1114, 1125(a). In its summary judgment motion directed to Huthwaite's trademark claims, Sunrise argues that Huthwaite has failed to show the fourth *PETA* element, namely that Sunrise used the mark "in connection with the sale, offering for sale, distribution, or advertising of goods and services."[11] While Sunrise admits that it trains its employees in the "SPIN Selling" sales method, and that it uses the SPIN and SPIN SELLING marks in connection with that training, Sunrise contends that this activity is conducted solely within Sunrise and primarily for the benefit of Sunrise, not its employees. Thus, Sunrise argues, the marks are not used in connection with "services," as the Lanham Act requires. The question presented, then, is whether, on this record, Huthwaite has made a sufficient showing that Sunrise's sales training program is itself a "service," or more broadly, whether Sunrise's use of the SPIN and SPIN SELLING marks constitutes a use "in connection with the sale, offering for sale, distribution, or advertising of goods and services."

Because the Lanham Act itself does not define what constitutes a "service," the term's meaning, as used in the statute, must be determined by reference to its plain meaning and the general purposes of the Lanham Act. Courts that have addressed this question have generally agreed that a "service" involves "the performance of labor for the benefit of another." *Morningside Group Ltd. v. Morningside Capital Grp., L.L.C.,* 182 F.3d 133, 138 (2d Cir.1999); *see also In re Canadian Pacific Ltd.,* 754 F.2d 992, 994 (Fed.Cir. 1985) (same).[12] This general definition is sensibly rooted in the text and purpose of

---

11. This language in the *PETA* opinion derives directly from the trademark infringement statute. *See* 15 U.S.C. § 1114. The Fourth Circuit panel in *PETA* made clear that the same test applies to unfair competition claims. *See PETA,* 263 F.3d at 364 & n. 2. The statutory language for unfair competition is virtually identical. *See* 15 U.S.C. § 1125(a)(1) ("Any person who, *on or in connection with any goods or services* ... uses in commerce ...") (emphasis added). The "commercial use" requirement for trademark dilution is discussed separately below. *See* 15 U.S.C. § 1125(c).

12. *See also Murphy v. Provident Mutual Life Ins. Co. of Philadelphia,* 923 F.2d 923, 927 (2nd Cir.1990) (holding that "services" "does not apply to services that are solely for the benefit of the performer; the services must be rendered to others"); *In re Dr. Pepper Co.,* 836 F.2d 508, 509 (Fed.Cir.1987) (holding that "the service ... must be rendered to *others*") (emphasis in original); *Trademark Manual of Examining Procedure ("TMEP")* 1301.01(a) (3d ed.2002) (stating that a "service must be performed to the order of, or for the benefit of, someone other than the applicant.").

The *TMEP* opinion describes two additional criteria that have been developed in the case law for determining what constitutes a "service," namely (i) that "a service must be a real activity," and (ii) that "the activity performed must be qualitatively different from anything necessarily done in connection with the sale of the applicant's goods or the performance of another service." *TMEP* § 1301.01(a). These criteria are not at issue here.

the statute, but requires further elaboration to answer two questions raised by the specific facts of this case.

The first question is whether the "for the benefit of another" standard requires that the activity merely be of *some* benefit to another, or whether it must be *primarily* for the benefit of another. In this regard, there is some, limited authority, relied on by Sunrise, suggesting that, "[t]o be a service, an activity must be primarily for the benefit of" another. *See TMEP,* § 1301.01(a)(ii) (citing *In re Venture Lending Associates,* 1985 WL 72117, 226 U.S.P.Q. 285 (Trademark Tr. & App. Bd.1985)).[13] But, the better reasoned and more recent authority, articulated most clearly by the Second Circuit in the *Morningside* case, is that the activity need not be "solely for the benefit of the performer"; in other words, it is sufficient to show that the activity "did provide valuable benefits to others." *Morningside,* 182 F.3d at 138; *see also Murphy v. Provident Mutual Life Ins. Co.,* 923 F.2d 923, 927 (2d Cir.1990) (holding that "services" may not be "solely for the benefit of the performer"). As noted in *Morningside,* "the goal of most service providers (unsurprisingly in a free enterprise economy) is ultimately to benefit themselves." *Morningside,* 182 F.3d at 138. In other words, both the performer and the recipient of a service will generally benefit from a service transaction. Thus, an inquiry into who *primarily* benefits from a service transaction must turn on which side in the circumstances got the better bargain, an inquiry that likely depends largely on one's perspective and hardly seems relevant to the question whether the transaction is properly characterized as a "service" for the purposes of the Lanham Act. Instead, the better approach, as stated in *Morningside,* is that an activity constitutes "providing 'services' within the meaning of the Lanham Act" if it provides "valuable benefits to others," provided "those 'others' are truly third parties." *Id.*

The second question concerns exactly "who is to be considered 'other' or 'another' consonant with the policies of trademark law." *In Re Canadian Pacific,* 754 F.2d at 994. This question generally arises with regard to whether shareholders, association members, or employees are "others" such that the Lanham Act reaches a company's use of an infringing mark with respect to these groups.[14] In confronting this question, most courts have rejected the notion that everything that occurs internally within a corporation or other entity cannot constitute a service to "others." Instead, courts have sensibly addressed the question by considering the

---

**13.** The Trademark Trial and Appeal board in *Venture Lending* distinguished that case from an earlier case where it was found that the activity was not a "service" because it "primarily benefit[ed]" the trademark applicant. *Id.* (citing *In Re Integrated Resources, Inc.,* 1983 WL 51982, 218 U.S.P.Q. 829 (Trademark Tr. & App. Bd.1983)). By contrast, the Trademark Trial and Appeal Board found that the activity in *Venture Lending* was a "service," noting that the applicant there was not the "prime beneficiary of the recited services," and that the "fact that applicant also derives some benefit … is not fatal on the question of the registrability of the mark." *Id.*

**14.** *See, e.g., id.* 1985 WL 72117, 226 U.S.P.Q. at 287 (holding that a reinvestment plan offered by a company solely to its own shareholders was not a "service" under the Lanham Act); *Amer. Int'l Reinsurance Co. v. Airco, Inc.,* 570 F.2d 941, 944 (Cust.Pat.App. 1978) (holding that a retirement plan offered by a company solely to its own employees was a "service" under the Lanham Act); *Capital Speakers Inc. v. Capital Speakers Club of Washington,* 1996 WL 754043, 41 U.S.P.Q.2d 1030 (Trademark Tr. & App. Bd.1996) (holding that services offered by a private association solely to its own members are "services" under the Lanham Act).

Lanham Act's purpose, namely, "to protect the *public* so it may be confident" in relying on the integrity of a trademark and to protect the trademark owner's investment of "energy, time, and money in presenting [his trademark and product] to the *public.*" *In Re Canadian Pacific*, 754 F.2d at 994 (emphasis in original).[15] Put differently, because the purpose of the Lanham Act is to protect "the goodwill established in the minds of the relevant buying public," it follows that the determination whether a service is provided to "another" must turn on whether the service recipients constitute "a segment of the public which purchases and benefits from a service provided by the owner of the mark." *In Re Canadian Pacific*, 754 F.2d at 994.[16] In other words, just because an activity is physically performed "in-house" does not mean that it is beyond the reach of the Lanham Act, as a segment of the relevant public may be found within the entity performing the service.

In this regard, at least one court has appropriately noted that the "fact that the services in question are offered only to . . . employees is of no moment" and does not preclude a finding that the services are offered for the benefit of another, as employees are not "strip[ped] . . . of their status as members of the public" merely because the services are provided by their employer. *In Re Canadian Pacific*, 754 F.2d at 995 (citing *Airco at* 944); *Capital Speakers*, 1996 WL 754043, 41 U.S.P.Q.2d at *7 (same). Thus, for example, the Federal Circuit's predecessor court noted in *AIRCO* that the employees who were provided with an "in-house" retirement income plan had the option of going to the marketplace and selecting a different plan. *See AIRCO*, 197 U.S.P.Q. at 943–44, 570 F.2d 941. In other words, the employees constituted part of the relevant public that purchases and benefits from retirement income plans, and the employer's use of a service mark in connection with its retirement plan served as any other trademark, namely to identify the plan as the employer's plan and differentiate it from other offerings. *See id.* (noting that "the fact that an employee may know that the services are provided by his employer does not preclude the mark from functioning to indicate origin"). As a result, the employer's provision of a retirement plan to its employees, even though wholly "in-house," was a "service" within the meaning of the Lanham Act. *Id.*

In sum, then, combining the general test with the two refinements discussed above,

---

**15.** It should be noted, however, that the Federal Circuit appears to have endorsed the more limited proposition that shareholders cannot be considered "other" than the corporation or part of the relevant "public," because they are "in fact and in law" a corporation's "owners," and because "all together they *are*" the corporation. *In Re Canadian Pacific*, 754 F.2d at 994.

**16.** *See also Capital Speakers*, 1996 WL 754043, 41 U.S.P.Q.2d at *7 (concluding that provision of services *to* private club members must be "services" under the Lanham Act because of the likelihood of confusion and unfairness if commercial entities were free to enjoy a free ride off the goodwill associated with the club's trademarks).

Some courts have used a similar approach with respect to the internal use of trademarks on goods. In a case considering what constitutes "actual use in trade" for the purpose of determining the first user of a trademark, the Fifth Circuit addressed the question of internal usage of a mark by noting that "there has to be an 'open' use, that is to say, a use has to be made *to the relevant class of purchasers or prospective purchasers* since a trademark is intended to identify goods and distinguish those goods from those manufactured or sold by others." *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1266 (5th Cir.1975) (emphasis added) (citing *Sterling Drug, Inc. v. Knoll A.G. Chemische Fabriken*, 159 U.S.P.Q. 628, 631 (Trademark Tr. & App. Bd.1968)).

an activity is a "service" within the meaning of the Lanham act if it involves the performance of labor for the benefit of another, provided (i) the other person or entity receives some valuable benefit from the performance, but not necessarily the sole or principal value, and provided (ii) the other person or entity is part of the relevant buying public.

■ In this case, Sunrise's sales training program clearly is a "service" within the meaning of the Lanham Act. First, there is no doubt that Sunrise's employees received a presumably valuable benefit from the training; they learned the SPIN Selling method. The purpose of the training program was to improve their performance as salespeople, and any such improvement would almost certainly redound to the individual salesperson's benefit, whether in the form of a higher salary, higher commissions, a promotion, or simply greater job security. Furthermore, employees leaving Sunrise are able to take their SPIN Selling training experience with them, and Huthwaite provided evidence suggesting that this may well be a valuable, marketable credential.[17] This factor is especially relevant given the high turnover among the Sunrise sales staff. Thus, although Sunrise's primary purpose in offering the sales training was surely to increase the performance of its sales staff and thereby improve its bottom line, rather than to provide a perk for its employees, the fact that training provided the employees with a valuable benefit is suffi-cient to satisfy the "for the benefit of another" test. *See Morningside* 182 F.3d at 138.

Second, there is similarly little doubt that the Sunrise employees who received the training are reasonably counted as among the relevant buying public for such training. This is so for two reasons. First, like many persons whose job entails a skill, they are free to seek training on their own to improve a relevant job skill. And, it is undisputed in the record that Sunrise employees can individually purchase Huthwaite's sales training services directly from Huthwaite during their employment by Sunrise. Second, those Sunrise employees that leave the company but remain in the sales business represent potential future customers of sales training services. Such employees who have received SPIN Selling sales training from Sunrise may well be less likely to purchase such training from Huthwaite, on the perhaps mistaken assumption, fostered by Sunrise's use of the marks, that the Sunrise training is the same as the Huthwaite training. And, their employers, on the same assumption, may also be less likely to purchase such services for them if the employers believe that they have already received such training. In short, given that Sunrise's internally-trained salespeople are constantly reentering the greater market for sales training services, Sunrise cannot plausibly argue that its employees are not a segment of that market.[18]

---

**17.** The record indicates that Hannan listed his SPIN Selling expertise on his resume, and Huthwaite argues that he was hired to bring that expertise to Sunrise's sales transformation program.

**18.** Sunrise's reliance on *Cormack v. Sunshine Food Stores Inc.,* 1987 WL 46890, 4 U.S.P.Q.2d 1366 (E.D.Mich.1987), is misplaced. *Cormack* involved two trademarked psychological questionnaires designed to screen job applicants for trustworthiness. *Id.* 1987 WL 46890, 4 U.S.P.Q.2d at 1367. The defendant in *Cormack,* the operator of a chain of convenience stores, copied those questionnaires and administered them to thousands of job applicants without license from the trademark owner. *Id.* The *Cormack* court concluded summarily that "the tests themselves are clearly not goods or services distributed to the public." *Id.* 1987 WL 46890, 4 U.S.P.Q.2d at 1369. Sunrise contends that its training pro-

In sum, an employer's sales training program, offered solely to its own current employees, constitutes a "service" within the meaning of the Lanham Act where, as here, the employees (i) receive a valuable benefit from the training and (ii) constitute a segment of the relevant market for such services.[19]

## C. Commercial use under the Federal Trademark Dilution Act

■ Sunrise's final summary judgment argument is that Huthwaite has not made a sufficient showing that Sunrise's use of the SPIN and SPIN SELLING marks constitutes "commercial use" as required by the trademark dilution statute.[20] See 15 U.S.C. § 1125(c) (requiring "commercial use in commerce of a mark or trade name"). As the parties have noted only in passing, trademark dilution claims differ in this respect from trademark infringement and unfair competition claims, which, as discussed above, require a showing that the mark was used "in connection with the sale ... of any goods or services." See 15 U.S.C. §§ 1125(c), 1114; 1125(a). The legal question presented here is whether the trademark dilution "commercial use" requirement differs from the Lanham Act's requirement that the alleged infringement occur "in connection with the sale of goods or services" language.[21]

The plain language of the statute requires only that the mark be used in a commercial setting, i.e. that it be used in connection with commerce. See Ford Motor Co. v. Greatdomains.Com, Inc., 177 F.Supp.2d 635, 648–49 (E.D.Mich.2001). And, "commercial" is "generally ... defined as relating to 'the exchange or buying and selling of commodities' or 'from the point of view of profit: having profit as the primary aim.'" Id. (citing Webster's

---

gram is analogous to the questionnaires administered by the defendant in *Cormack*. Yet, *Cormack* is clearly distinguishable from this case, and is fully consistent with the test for a "service" articulated and applied here. First, unlike the training program at issue here, the psychological screening in *Cormack* did not meaningfully "benefit" the potential employees; it redounded solely to the benefit of the employer. Second, the potential employees in *Cormack* are plainly not part of the relevant market for employee trustworthiness questionnaires.

19. This is not to say, of course, that a company's internal training program will always be a "service" within the meaning of the Lanham Act. An employer's sales training program could fail to satisfy this test in several respects. For example, if an internal sales training program were offered only to a limited set of long-term employees and had essentially no applicability outside of the company, the employees would clearly not constitute a segment of a relevant market for such training and the training program would not be a "service" within the meaning of the Lanham Act.

20. Sunrise additionally challenges the trademark dilution claim on grounds that Huthwaite has failed to show actual injury to the economic value of its mark with regard to its dilution claim as required by *Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). Huthwaite contends that it has demonstrated actual harm, claiming, at a minimum, that at least one Huthwaite customer is now aware that Sunrise is using Huthwaite marks without paying for them. For its part Sunrise contends that this showing is insufficient. It is premature to decide the actual harm question on the basis of this motion, before discovery is completed and without the benefit of a more detailed record regarding Huthwaite's claim of actual harm.

21. The Fourth Circuit in *PETA* did not reach the plaintiff's trademark dilution claim, as the plaintiff prevailed on other trademark claims sufficient to justify the remedy sought, and thus did not address the question of what constitutes "commercial use," and whether that standard differs from the "in connection with the sale, offering for sale, or distribution of goods and services" standard. *PETA*, 263 F.3d at 371 n. 3.

3d New International Dictionary 456 (1981)). In other words, commercial use is to be contrasted with personal or private use which is not related to the buying or selling of goods and services.[22] In practice, the "commercial use" requirement is virtually synonymous with the "in connection with the sale, offering for sale, distribution, or advertising of goods and services" requirement; the latter essentially defines the former. Indeed, some authorities have implicitly or explicitly substituted the "in connection with" formulation for the "commercial use" standard. *See id.* at 650 n. 8 (noting that a requirement that the mark be used "in connection with goods or services" may be inferred from the [statute's] requirement that the "use in commerce" be "commercial."); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:76 at 25–229 (4th ed.2001) (noting that "[w]hile the statute does not require that there be advertising or a sale of goods or services, 'commercial use' implies a place where some business is carried on or goods or services or sold, distributed or advertised for sale.").

Worth noting, too, is that the trademark dilution requirement of "commercial use in commerce" is accompanied by an explicit statutory exception for "non-commercial use." *See* 15 U.S.C. § 1125(c)(4)(B). This exception is generally understood to "prevent courts from enjoining constitutionally-protected speech" under the trademark dilution statute. *Panavision Int'l L.P. v.*

*Toeppen,* 945 F.Supp. 1296, 1303 (C.D.Cal. 1996), *aff'd* 141 F.3d 1316 (9th Cir.1998) (citing legislative history to the effect that the dilution statute is not intended to reach "noncommercial expression, such as parody, satire, editorial and other forms of expression that are not part of a commercial transaction."); *McCarthy,* § 24:97.2 (noting that the "non-commercial use" exception is intended (i) to incorporate the Supreme Court's concept of "commercial speech," and (ii) to prevent the use of the dilution statute to enjoin the use of marks in "non-commercial" settings such as consumer product reviews). Thus, for example, the Ninth Circuit found that the use of the BARBIE mark in a pop song constituted "commercial use," because the mark was used commercially in connection with the sale of the Barbie Girl single and the album it appeared on, but nonetheless fell outside the reach of the trademark dilution statute because that commercial purpose was "inextricably intertwined" with the "expressive elements" of the song, which are protected under the First Amendment. *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 903, 907 (9th Cir.2002).

Here, Sunrise's use of the SPIN and SPIN SELLING marks is plainly "commercial use" as required by 15 U.S.C. § 1125(c). Sunrise is a commercial entity, and its training activities serve commercial purposes, namely to increase Sunrise's sales of its assisted living services. In other words, the training is conducted with

---

**22.** An illustrative example of the distinction between the commercial and non-commercial use of a mark is provided in *HQM, Ltd. v. Hatfield,* 71 F.Supp.2d 500 (D.Md.1999). The Plaintiff, HQM, Ltd. used the HATFIELD mark in connection with its sale of meat products under a HATFIELD logo, clearly a "commercial use." By contrast, the defendant, Mr. Hatfield, used the HATFIELD mark, his own last name, in registering the <hatfield.com> domain name and activating it for personal email purposes. *Id.* at 501, 503. Mr. Hatfield's use of the HATFIELD mark was found not to constitute "commercial use," as there was no allegation he was conducting any business using the domain name or was interested in selling the domain name itself. *Id.* at 506–08; *compare Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1325 (finding the registration of a trademark as a domain name to be "commercial use" where "[the defendant]'s 'business' is to register trademarks as domain names and then sell them to the rightful trademark owner.").

a view to making a profit, and thus is indisputably commercial. It follows, then, that Sunrise's use of the SPIN and SPIN SELLING marks in relation to the training program is a "commercial use" of the mark. Nor has Sunrise argued that its use of the marks falls under the "non-commercial" use exception. Accordingly, Huthwaite has clearly made a sufficient showing that Sunrise's use of the mark is "commercial use," and Sunrise's motion to dismiss the trademark dilution claim on this ground must be denied.

An appropriate order denying Sunrise's motion for summary judgment on all counts has issued.[23]

---

**23.** *See Huthwaite, Inc. v. Sunrise Assisted Living, Inc.,* Civil Action No. 02–1478–A (March 14, 2003) (Order).